IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Statesboro Division

**FILED**
**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Brunswick, Georgia**
*By arowe at 4:02 pm, Aug 29, 2014*

IN RE:                          )
                                )       CHAPTER 7 CASE
JEFFERY A. MAY                  )       NUMBER <u>12-60371</u>
                                )
     Debtor                     )
_____)
                                )
PIONEER CONSTRUCTION, INC.      )       ADVERSARY PROCEEDING
                                )       NUMBER <u>12-06020</u>
     Creditor/Plaintiff         )
                                )
v.                              )
                                )
JEFFERY A. MAY                  )
                                )
     Debtor/Defendant           )

**OPINION AND ORDER**

This matter came on for trial on the Complaint to Determine
Dischargeability of Debt filed by Pioneer Construction, Inc.
("Plaintiff") against Jeffery A. May ("Debtor"). (ECF No. 16;
A.P. ECF No. 1.)[1] The Complaint contends that a February 7, 2012,
Consent Judgment ("Consent Judgment") entered against the Debtor
by the Superior Court of Bulloch County, Georgia, held the Debtor
liable for willful conversion of payments for real property
improvements under O.C.G.A. §§ 16-8-15 and 51-10-6. (A.P. ECF No.

___

[1] References to the docket of the underlying chapter 7 case appear in the
following format: "(ECF No. __.)" References to the docket of this adversary
proceeding appear in the following format: "(A.P. ECF No. __.)"

AO 72A

(Rev. 8/82)

improvements under O.C.G.A. §§ 16-8-15 and 51-10-6. (A.P. ECF No. 1 ¶¶ 9, 10.) According to the Plaintiff, the Consent Judgment conclusively determines that the Debtor's actions constitute a willful and malicious injury to the property of another and therefore establishes the Plaintiff's claim as nondischargeable under 11 U.S.C. § 523(a)(6). (Id. ¶ 11.)

A trial was held on April 21, 2014, after which I took the matter under advisement. I have considered the stipulated facts, testimony, documentary evidence, and oral arguments presented by the parties. For the reasons that follow, I find that Plaintiff's claim does not fall within the exception of 11 U.S.C. § 523(a)(6) and that debt is therefore dischargeable.

## FINDINGS OF FACT

The Debtor is the former CEO and CFO of May Specialty Fabricators, Inc. ("May Specialty"), a structural and miscellaneous steel fabrications subcontractor. (Stip., Att. A of A.P. ECF No. 49 at 9, ¶ 4.) The Plaintiff is a general contractor that regularly engages in public works construction. The Plaintiff's claim against the Debtor arises from May Specialty's failure to pay one of its suppliers for materials used in a public construction project. (See May 16, 2011, Superior Court Compl., Pioneer Construction, Inc. v. May Specialty Fabricators,

Inc. and Jeffery A. May, Civil Action No. 1B11CV-284-W, Pl.'s Ex. 17.)

On May 15, 2008, the Plaintiff entered into a contract with the Georgia Ports Authority to provide construction materials and labor to real property known as Container Berth Eight Reefer Racks, Garden City, Georgia ("Reefer Racks Project"). (Stip., Att. A of A.P. ECF No. 49 at 9, ¶ 1.) On July 21, 2008, the Plaintiff entered into two contracts with May Specialty for work on the Reefer Racks Project: a construction subcontract ("Subcontract") and a separate purchase order ("Purchase Order"). (See Stip., Att. A of A.P. ECF No. 49 at 9, ¶ 3.) The Debtor did not personally guarantee May Specialty's performance under either agreement.

Under the Subcontract, May Specialty would be paid $160,000.00 for "Labor, Materials and Supervision for the erection of structural steel, steel stairs & railings and miscellaneous steel fabrication as per contract plans and specifications dated April 3, 2008." (July 21, 2008, Subcontract Agreement between Pioneer Construction, Inc. and May Specialty Fabricators, Inc., Pl.'s Ex. 7 at 24.) The Subcontract also obligated May Specialty to broadly indemnify the Plaintiff:

> 16.1 **SUBCONTRACTOR'S PERFORMANCE:** The Subcontractor shall indemnify and save harmless the Owner and the Contractor, including their officers, agents, employees, affiliates, parents and subsidies, and each of them, of and from any and all claims,

demands, causes of action, damages, costs, expenses, **actual attorneys' fees**, losses or liabilities arising out of or in connection with the Subcontractor's operations to be performed under this Agreement for, but not limited to:

. . .

16.1.4   Claims and liens for labor performed and materials used and furnished on the job, including all incidental and consequential damages resulting to the Contractor or Owner from such claims or liens.

. . .

16.2   **CLAIMS DEFENSE PROCEDURES:** Should any claims, demands, causes of action, damages, costs, expenses, actual attorneys' fees, losses or liabilities arising out of or in connection with the Subcontractor's operations, as defined in Article 16, Paragraph 16.1, the Subcontractor shall:

16.2.1.   At the Subcontractors own cost, expense and risk, defend all claims, as defined in Article 16, Section 16.1, that may be brought or instituted by third persons, including but not limited to government agencies or employees of the Subcontractor, against the Contractor or the Owner or their agents or employees or any of them.

16.2.2.   **Assume, satisfy and pay all costs associated with any judgment or decree that may be rendered against the Contractor** or the Owner or their agents or employees, or any of them, arising out of any such claim; and/or:

16.2.3.   **Reimburse the Contractor or the Owner or their agents of employees for any and all legal expenses incurred** by any of them in connection herewith or in enforcing the indemnity granted in this Article 16.

(Subcontract, Pl.'s Ex. 7 at 18-19) (emphasis added.)

The Purchase Order provided that May Specialty would be paid $953,500.00 to "Furnish, F.O.B. Project Site, all structural steel, miscellaneous steel fabrications, anchor belts, metal decking, epoxy kits, steel pipe bollards, metal fasteners and all other materials required for a 100% complete operational system." (July 21, 2008, Purchase Order Agreement between Pioneer Construction, Inc. and May Specialty Fabricators, Inc., Pl.'s Ex. 6 at 5.)

May Specialty subcontracted with The Haskell Company ("Haskell") to supply a portion of the construction materials due under the Purchase Order ("Supplier Contract"). (Stip., Att. A of A.P. ECF No. 49 at 9, ¶ 3.) The injury at issue in this case arose when May Specialty failed to pay Haskell with the proceeds from the Plaintiff's final payment on the Purchase Order. Since the Reefer Racks Project was a public construction contract, Georgia law required the Plaintiff to post a payment bond to ensure the payment of all parties contributing to the construction. (See Stip., Att. A of A.P. ECF No. 49 at 9, ¶ 2.) May Specialty's failure to pay the full amount due on the Supplier Contract allowed Haskell to make a claim against the payment bond.

AO 72A
(Rev. 8/82)

### Plaintiff's Payment Bond

On May 20, 2008, the Plaintiff obtained a bond from The Ohio Casualty Insurance Company ("Surety") for the full amount due on the Reefer Racks Project, $1,963,900.00. (See Stip., Att. A of A.P. ECF No. 49 at 9, ¶ 2.) In compliance with O.C.G.A. § 13-10-63, the payment bond provided that any supplier or subcontractor who had not been paid in full for materials furnished or labor provided "shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of commencement of such action and to prosecute such action to final execution and judgment for the sum or sums due to him." See O.C.G.A. §§ 13-10-60, et seq; (The Ohio Casualty Insurance Company Payment Bond 3-913-375, Pl.'s Ex. 5 at 7.)

The payment bond did not require potential bond claimants to have a contractual relationship with the Plaintiff in order to collect on the bond. (See id.) In order to maintain an action on the payment bond, Georgia law only requires a bond claimant to provide:

> [W]ritten notice to the contractor within 90 days from the day on which such person did or performed the last of the labor or furnished the last of the material or machinery or equipment for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was performed or done.

O.C.G.A. § 13-10-63(a)(1).

However, a general contractor may significantly limit this otherwise broad exposure to remote bond claimants by complying with O.C.G.A. § 13-10-62(a), which requires the general contractor to, within 15 days after physical construction begins, 1) post a Notice of Commencement at the public works construction site and 2) file the same Notice of Commencement with the Superior Court in the county in which the site is located. O.C.G.A. § 13-10-62. Compliance with O.C.G.A § 13-10-62(a) bars all parties without a direct contractual relationship to the general contractor from proceeding against the bond, unless the potential bond claimant provides written notice detailing its contribution to the project "within 30 days from the filing of the notice of commencement or 30 days following the first delivery of labor, material, machinery, or equipment, whichever is later." See O.C.G.A. § 13-10-63(a)(2).

On June 5, 2008, the Plaintiff recorded a Notice of Commencement for the Reefer Racks Project in the Superior Court of Chatham County, Georgia. (See Jan. 11, 2010, Order on Motions for Summary Judgment, The Haskell Company v. Pioneer Construction, Inc., et al, Civil Action No. CV09-171BA, Def.'s Ex. 12 at 2.) However, the Plaintiff failed to post a Notice of Commencement at the job site. (Id.) This oversight allowed parties without a contractual relationship to the Plaintiff, such as Haskell, to proceed against the payment bond under the more

relaxed notice requirements of O.C.G.A. § 13-10-63(a)(1)—90 days from the claimant's last work on the project—instead of the more stringent requirements of O.C.G.A. § 13-10-63(a)(2)—30 days from the claimant's first work on the project. (See id.) Haskell made its first delivery to the job site on July 28, 2008. (See Pl.'s Ex. 8.) It made its last delivery on September 29, 2008. (See id.) Haskell provided written notice of its intent to state a claim against the payment bond to the Plaintiff on November 24, 2008. See Jan. 11, 2010, Order on Motions for Summary Judgment, The Haskell Company v. Pioneer Construction, Inc., et al, Civil Action No. CV09-171BA, Def.'s Ex. 12 at 3.) Thus, had the Plaintiff posted a Notice of Commencement at the jobsite, Haskell's claim would have been time-barred under O.C.G.A. § 13-10-63(a)(2). (Id. at 7-8.)

### May Specialty's Strained Relationship with Haskell

May Specialty had an established relationship with Haskell, having worked almost exclusively as a subcontractor or supplier to Haskell for the previous two years. (See MSF, Inc./Haskell-Quotes v. Budget Pricing, Def.'s Ex. 3.) According to the Debtor, Haskell had considered buying May Specialty in August of 2007, but had ultimately passed after seeing the Debtor's financials. (See Debtor Dep. 48:8-48:16, June 12, 2013, A.P. ECF No. 63.)

The working relationship between Haskell and May Specialty was not always a happy one. According to the Debtor, Haskell had developed a pattern of using its leverage as a general contractor to pressure May Specialty into charging less than its quoted price; the Debtor maintains that this practice effectively left May Specialty without a profit:

> They continuously contracted with me to do projects based on 50 percent completed drawings. I would quote the project from 50 percent drawings. They would later issue a purchase order and start sending me 100 percent complete drawings where a tremendous amount of additional work had been added. In trying to bill and modify the purchase orders from Haskell, promises were made on more profitable projects. They even at one time offered to buy me out. But at no time did they ever try to make up my losses and any kind of settlement despite all my pleadings since June of '08.

(Debtor Dep. 33:4-33:14, June 12, 2013, A.P. ECF No. 63.)

According to the Debtor, Haskell's bidding practices forced May Specialty into a losing contract with the Plaintiff. (See Joint Ex. 1.) May Specialty relied on Haskell's verbal quote to bid the Reefer Racks Project. (See Joint Ex. 1; Pl.'s Exs. 1, 2). Before bidding the Reefer Racks Project, one of Haskell's project managers gave May Specialty a verbal quote of $2,500.00 to $3,000.00 per ton of steel. (See Joint Ex. 1.) Based on that estimate, May Specialty's quote to the Plaintiff assumed a cost of $2,750.00 per ton. (See id.) May Specialty submitted its bid on May 1, 2008. (See Pl.'s Ex. 1.) On May 7, 2008, Haskell finalized its price at $3,250 per ton. (See Pl.'s Ex. 2.)

May Specialty's quote to the Plaintiff specifically provided: "All material is predicated on current day mill prices. Any increase in price of material, freight or labor, additional costs including applicable overhead plus profit would have to be assumed by the owner/general contractor." (Pl.'s Ex. 1.) Work on the Reefer Racks Project did not begin until the Plaintiff gave May Specialty notice to proceed on May 16, 2008. The Purchase Order was not executed until July 25, 2008. (See Pl.'s Ex. 7.)

Despite the ample opportunity to negotiate an increased price with the Plaintiff, May Specialty chose to absorb the costs of the increased price based on the hope it would lead to more work with Haskell even though the increase cost provision was under the Purchase Order with the Plaintiff, not Haskell:

> **Q:** So at the time you entered in to the purchase order you were already fully aware of any issue with varying quotes by Haskell, correct?
> **A:** Yes, sir.
>
> **Q:** Did you tell Pioneer that you weren't going to be able to afford to do the job based on bad quotes from a supplier?
> **A:** No, sir. I had ... within the context of what you're describing, Haskell made up 95 percent of my income whether they worked for me or I worked for them. All negotiations to try to clear up discrepancies was done on numerous projects, future projects, promised projects.

(Debtor Dep. 45:23-46:10, Sept. 12, 2013, A.P. ECF No. 63.)

On June 17, 2008, the Debtor emailed Haskell with an issue regarding the quoted price of an unrelated construction project

in New Jersey ("New Jersey Project"). (See June 17, 2008, Email, Joint Ex. 1.) Haskell had subcontracted May Specialty to fabricate steel stairs for the New Jersey Project. (See id.) May Specialty quoted its work for the New Jersey Project at $292,000.00 based on incomplete shop drawings. (See Nov. 21, 2008, Letter from Jeff May to Steve Gibson and Boyd Worsham, Def. Ex. 2 at 1-2.) After May Specialty made its first shipment, Haskell responded that the work had been budgeted for only $150,000.00. (See id.)

Although the tone of the email was conciliatory, the Debtor clearly expressed his grievances with Haskell's business practices:

> I have gotten very comfortable working within the Haskell budget. I am not getting rich because we know what this stuff costs to build. You guys have always been fair to me. Sometimes you add money to some jobs I quote but most of the time I trim my price to your budgetary number. This process for 2 years has been extremely fair and I have come to consider my company as the northern extension of Haskell Steel. [The New Jersey Project] however is an exception.
> The trend has been to get me to quote your work from partial sets of [drawings], contract [drawings] or not approved [drawings]. Nestle is a good example. I did not get the pipe bollards and goal posts [drawings] until I had fabricated, shipped and gotten paid for the entire job. The material cost was in excess of $12,000 dollars. From the time Guy gave me the job until I got the fast release, pipe had basically doubled in price, I did not complain I just ordered the material knowing I would make it up down the road, but my profitability on that project was shot.
>   . . .
> When I got Bill to look at [the Reefer Racks Project] for a verbal range for the structural we

> discussed 2,500-3,000 per ton. I plugged in $2750 as my price per ton. I wanted this job for the stair & rail work and felt it would be a great fab job for Haskell. After a complete review of the [drawings] a quoted price of $3,250 was given. Granted it included other items that brought it closer to my budget but still I had to cut my stair & rail price to make the bid work with Haskell's number.
>
> My point is that I cannot meet the budget number of $150,000 for [the New Jersey Project]. I believe rising steel prices from bid day until now coupled with a misunderstanding of the volume of prep work required for these TS stairs has over-run the budget number. I do not need to lose this relationship but I also don't need to lose my behind either. Please discuss this project and my quote based on the mutual exchange of work between our companies and let me know what my options are.
>
> I would like to point out that these problems would not be an issue if myself and my guys were Haskell employees.

(June 17, 2008, Email, Joint Ex. 1.)

The New Jersey Project continued to be problematic for May Specialty. There were issues with the shipping and installation of the handrails May Specialty had fabricated. (See Aug. 8-11, 2008, Emails, Def.'s Ex. 1 at 2-3.) The installation problems at the New Jersey Project continued to accumulate until the Debtor was forced to travel to New Jersey to address them. The Debtor blamed Haskell for much of the cost May Specialty incurred in doing so:

> The union erection company had a clause in their contract. This clause stated that if during handrail installation if the pipe joint could not be damped with a jewel clamp and welded, the erector would be paid extra to fix the joint. In the steel business that is a license to steal, and that is what happen. Everyone in this business knows that I should have been made aware

> of that clause. I would have either opted not to do the job or asked that I be allowed to install my own work.
>   . . .
>
> [A New Jersey Contractor] took me inside the existing building during my 2nd jobsite visit. While looking at the same problems with the bowed rails in the existing building I commented on why I was being thrown under the bus when the existing building had the same conditions. He stated that Haskell Steel fabricated the first job and we had the same problems with the erectors and inspectors.

(Nov. 21, 2008, Letter from Jeff May to Steve Gibson and Boyd Worsham, Def. Ex. 2 at 2) (emphasis in original).

The tensions came to a head in August 2008 when Haskell awarded a large steel fabrication subcontract to another subcontractor despite, according to the Debtor, having implied the contract would be awarded to May Specialty. (See id.)

In an email dated August 8, 2008, the Debtor expressed his frustration in a decidedly more aggressive tone than that of the June email:

> Like probably many other subcontractors before me, I am out!!! I cannot keep the pace. In a conversation with Boyd a few weeks ago I was told that Haskell just wanted "High Quality work at Cheap Prices delivered in Record Time without any Mistakes." I laughed about it then, it's not funny anymore. . . . I am one man with 14 employees. I wear all the hats necessary to keep a small company afloat and the bills paid. I have bared my soul numerous times to Haskell employees about small company issues working for a company the size of Haskell. I have kissed more ass than I care to remember.

(Aug. 8-11, 2008, Emails between Jeff May and Boyd Worsham, Def.'s Ex. 1.) The email also threatened to end May Specialty's

AO 72A
(Rev. 8/82)

relationship with Haskell: "I have no other work booked because I was told not to chase other work, that Gulfstream was *my* job. I am very grateful for past work. I simply cannot continue this relationship any further under the present terms it is not worth it to me any longer." (Id.)

In response, Haskell called May Specialty's bluff: "If you want to divorce us simply quit pricing our work." (Id.) The Debtor immediately backtracked and attempted to smooth over his previous threats:

> All this being said about money, no one at Haskell can ever say I have been hard to work with on the issue of being a team player. I always look to make it up down the road. The problem is that I am not making it up. Since the time that you and Steve visited my shop around Labor Day of last year I have not retired any additional debt working with Haskell. Now with the Reefer Racks job I am on a break-even pace for 2008.
> . . .
> It does not take a rocket scientist to see that I need this relationship. For basically two years I have provided quality work at an affordable price. Now it seems no matter which way I turn I am only making the problem worse. Stop for a moment and put yourself in my shoes. The pressure of keeping up from my perspective can be crushing. Steve once told me that when they consider me for a job, that he takes the misc. budget, factors out the cost of dealing, keeps the profit margin as a management fee and gives the balance to me as a price. If you guys keep the profit margin for the work that I do and then you keep the profit margin for the work that you do for me THERE IS NO PROFIT LEFT!!!!

(Aug. 8-11, 2008, Emails between Jeff May and Boyd Worsham, Def.'s Ex. 1.)

May Specialty and Haskell agreed to meet and resolve their differences. (See id.) There is no evidence in the record regarding the discussion at the meeting or the nature and terms of any resulting resolution. However, in an email sent on August 19, 2008, the Debtor extended his apologies to the Haskell officers who were not present at the meeting, and indicated the issues between May Specialty and Haskell had been completely addressed. (See Aug. 19, 2008, Email, Pl.'s Ex. 21.)

### May Specialty's Failure to Pay Haskell's Last Invoice

Over the course of the Reefer Racks Project, May Specialty ordered three shipments of structural steel from Haskell, totaling $575,855.00. (See Aug. 14, 2008, Haskell Steel Fabrication Invoice, Pl.'s Ex. 8.) May Specialty paid Haskell's first two invoices, totaling $353,851.00, with progress payments made by the Plaintiff. Haskell sent its last invoice for $222,004.00 to May Specialty on September 29, 2008. (See id.)

On November 7, 2008, the Plaintiff made its final payment of $384,250.00 to May Specialty. (See Apr. 30, 2008-Feb. 28, 2009, Bank Account Statement of May Specialty Fabricators, Inc., Joint Ex. 6 at 19-21.) Unbeknownst to the Plaintiff, May Specialty was insolvent when it received the final payment for the Reefer Racks Project. (See id.; Debtor Dep. 50:01-52:10, Sept. 12, 2013, A.P. ECF No. 63.) On November 5, 2008, May Specialty's operating

account had a negative balance of $70,880.67. (See Debtor Dep. at 29:24-30:02.)

From when it received its final payment on November 7 to November 15, May Specialty paid out approximately $283,840.45 to various accounts payable. (See Joint Ex. 6 at 19-21.) Of this amount, May Specialty paid $245,072.55 on November 11 alone. (See id. at 19-20.) This boom and bust payment cycle was consistent with May Specialty's prior business practices. (See Joint Ex. 6 at 1-3, 7-9, 14.)

At trial, neither the Debtor nor the Plaintiff could positively identify which creditors had provided goods or services for the Reefer Racks Project. The Debtor testified that, although he did not keep a record of which accounts payable were connected with which project, he was confident the majority of the accounts payable contributed to the Reefer Racks Project:

> **Q:** Now, were all of these payments made for supplies, materials or work that was done in connection with the [Project]?
> **A:** That was primarily the only significant project I had at the time.

(Debtor Dep. 37:06-37:10, Sept. 10, 2013, A.P. ECF No. 63.)

Despite this uncertainty, the record clearly establishes that May Specialty used the vast majority of the funds to pay its business debts and expenses:

|  | | Percentage of $384.250.00 (Plaintiff's Final Payment) | Percentage of $395,136.26 (May Specialty's Post-11/7 Income) |
|---|---|---|---|
| **Balance on 11/7** | $370,079.33 | | |
| Accounts Payable | ($283,840.45) | 73.87% | 71.83% |
| Business/Overhead Expenses | ($56,473.00) | 14.70% | 14.29% |
| Payments to Wife's Business | ($37,536.47) | 9.77% | 9.50% |
| Medical Expenses | ($5,255.02) | 1.37% | 1.33% |
| Personal (Ex-Wife, Gifts, Travel, and Food) | ($12,031.32) | 3.13% | 3.04% |
| Income | $25,056.93 | | |
| **Total** | $0.00 | 102.83% | 100.00% |

(See Joint Ex. 6.) The record also establishes that May Specialty preferred its other creditors to the detriment of Haskell:

> **Q:**  How did you decide who to pay out of the funds received from Pioneer?
> **A:**  All of my accounts payable at that time, it was —— I paid everybody that I owed at that time.
>
> **Q:**  Everybody but Haskell?
> **A:**  Yes, sir.

(Debtor Dep. 36:25-37:05, Sept. 10, 2013, A.P. ECF No. 63.)

### May Specialty's Dispute with Haskell

As of November 15, 2008, less than $23,000.00 remained in May Specialty's operating account. (Joint Ex. 6 at 19-21.) On November 18, May Specialty emailed Haskell that it was withholding final payment on the Reefer Racks Project until Haskell paid $40,200.00 owed on two other purchase orders. (Nov. 18, 2008, Email, Pl.'s Ex. 34.) On November 21, Haskell responded by giving May Specialty everything it had asked for in its November 18 demand email. (Nov. 21, 2008, RE: Current Status Email, Joint Ex. 3.) After offsetting the $40,200.00 demanded and crediting May Specialty with $1,834.00 for touch-up repairs on the Reefer Racks Project, Haskell offered to settle for $180,000.00. (Id.)

In an email dated November 21, 2008, May Specialty revised its demand upward; the email expanded the scope of May Specialty's issues by outlining the significant disparities between the quotes May Specialty accepted and Haskell's eventual budget on various projects. (Nov. 21, 2008, Current Payment Status w/Haskell Email, Pl.'s Ex. 35.) According to the email, May Specialty had suffered $282,664.00 in combined losses on Haskell projects in the previous year. (Id.) The letter added the combined losses to May Specialty's initial demand for $40,200.00 in unpaid invoices, then offset that amount by the $220,040.00

18

due to Haskell on the Reefer Racks Project for a total demand of $100,660.00. (Id.)

In a letter to Haskell, also dated November 21, 2008, the Debtor again revised his settlement offer; this time factoring in profit made off sales to Haskell, for a total due of $76,905.00. (Def.'s Ex. 3.) The Debtor also advised Haskell that any suit against May Specialty would be fruitless:

> If you choose to come after me then that is your choice. I will save you the time and expense of legal fees. Twice in 2007 I provided Boyd everything he needed to present my company to management for purchase. Everyone in the Haskell organization knew I was upside down in my financials. I even got my bank on the 2nd presentation to agree to a write down of my debt. Still Haskell was not compelled to buy me out. So there is nothing here. Spend the additional money if you want, but it will accomplish nothing.
>
> I have one final request. In the past when we have gotten to a similar point like this the calls and emails are incessant. I am broke so there is no need to continue to try and get me to discuss this. I was discussing for months without help. The point of discussion is over. Do as you seem right. I would add that an honorable company would concede that I have been treated unjust and concede that my attached settlement is fair. You decide.

(Id.) The Debtor's decision to rekindle his grievances against Haskell just as May Specialty's financial situation was spiraling out of control was clearly not coincidental. It is particularly clear in retrospect that, to some extent, May Specialty embellished its claims against Haskell:

> Q: As of August 1 of 2008 you were not in a dispute with Haskell or claiming that Haskell owed you money, were you?

**A:**    That can't be answered yes or no.

**Q:**    Okay.
**A:**    Haskell was a -- is a massive company. They had already made a bid to purchase me where I bared my soul to them, financials, everything. They knew more about my business than I did myself I think. In construction leading up to November of ' 08 everybody was trying to survive by any means possible. Did I brag on them to try to salvage a David and Goliath relationship, absolutely. Was it the truth, it was salesmanship to try to get out of them what I needed to survive.

**Q:**    Fine. But as of that time period, August 1 of 2008 you weren't saying, Haskell, you owe me money and I'm not going to pay you if you don ' t - if you don't come clean with me?
**A:**    No. No, sir.

(Debtor Dep. 48:03-48:21, Sept. 12, 2013, A.P. ECF No. 63.)

### Debtor's Communications with the Plaintiff Regarding the Dispute

The Debtor was less than forthcoming with the Plaintiff regarding the dismal financial state of May Specialty. The Debtor kept the Plaintiff in the dark to secure May Specialty's final progress payment:

**Q:**    In any correspondence with Haskell that you've mentioned, prior to depositing the Pioneer check on November 7, did you tell Haskell that you were going to withhold funds from their last payment?
**A:**    Not that I remember.

**Q:**    But you know that had you told them that then they would have communicated that to Pioneer and you wouldn't have gotten your last payment, right?
**A:**    Can you restate that again, please?

**Q:**    Well, if you had --you knew good and well if you told Haskell I'm not going to pay you that they would have gone straight to Pioneer, correct?
**A:**    I'm sure.

AO 72A

(Rev. 8/82)

> **Q:**   So you wouldn't have gotten the payment that you
> deposited on November 7, correct?
> **A:**   Yes.

(Debtor Dep. 41:08-41:23, Sept. 12, 2013, A.P. ECF No. 63.)

After receiving the final progress payment, the Debtor continued to lie to the Plaintiff. On November 16, despite having only a tenth the amount due to Haskell available, the Debtor assured the Plaintiff that he had been advised by a lawyer to withhold Haskell's payment until their dispute could be resolved:

> I have had a storm brewing between me and Haskell since
> June 08. I am holding their last payment for the
> [Reefer Racks Project] under advice of legal counsel. I
> have a meeting Wednesday at 4:00 with my attorney to
> discuss the final outcome of Haskell & [May Specialty]
> for over 2 years of work between the 2 companies. Sort
> of a David v. Goliath problem.

(Nov. 16, 2008, Email, Joint Ex. 2.)

Whether the Debtor ever actually received advice from an attorney to this effect is unclear. (See Craig S. Bonnell Dep. 13:17-21:24, July 17, 2013, A.P. ECF No. 62. William A. White Dep. 6:19-9:20, Sept. 10, 2013, A.P. ECF No. 64.) However, the point is irrelevant. Even if the Debtor had been advised to withhold payment from Haskell until a settlement could be negotiated, such advice would have no effect on the outcome of this proceeding because the Debtor did not follow it. He was not holding the last payment; he was using those funds to pay May

21

Specialty's preferred creditors. (See Debtor Dep. 36:25-37:10, Sept. 10, 2013, A.P. ECF No. 63.)

The Plaintiff was unaware of the true scope of the dispute between May Specialty and Haskell until November 24, 2008, when Haskell served the Plaintiff with a notice of its intent to pursue a claim against the Payment Bond if not paid within thirty days. (See Nov. 24, 2008, Bond Notice Letter to Pioneer, Pl.'s Ex. 36; Nov. 25, 2008, Haskell vs. MSF, Inc. Email, Pl.'s Ex. 39.) Despite having received an offer to settle on November 21, the Debtor told the Plaintiff that Haskell was intentionally avoiding his attempts to resolve their dispute. (See Nov. 25, 2008, Haskell vs. MSF Inc. Email, Pl.'s Ex. 39; Nov. 21, 2008, RE: Current Status Email, Joint Ex. 3.) The Debtor assured the Plaintiff that the dispute remained between May Specialty and Haskell:

> They are trying to avoid dealing with me directly. Haskell employs 1200 employees. They had Steve Gibson GM of the Steel Division who is way down their food chain to write this letter as a warning shot at me. If they wanted to come after [Plaintiff's] Bond they would not have given you 30 days.

(Nov. 25, 2008, Haskell vs. MSF Inc. Email, Pl.'s Ex. 39.) The Debtor explained his motivation:

> **Q:** And by November 12th you had spent all but $26,000 of the money, right; is that correct? You can look at the exhibit.
> **A:** No. Yes, sir, you are exactly correct. My state of mind at that time was I knew May Specialty Fabricators' tenure in business was over. I had already sought

counsel from two different attorneys and basically, for lack of a better explanation, I was buying time for the demise of my business.

(Debtor Dep. 49:23-50:06, Sept. 10, 2013, A.P. ECF No. 63.)

### Haskell's Claim against the Plaintiff's Payment Bond

On November 24, 2008, within ninety days of its last delivery, Haskell sent notice to the Plaintiff that it had not been paid the amount due on its Supplier Contract with May Specialty and stated it would seek to enforce its rights under the payment bond if not paid by December 24, 2008. (See November 25, 2008, Bond Notice Email.)

On January 22, 2009, May Specialty again revised its claim against Haskell, this time offering to settle for $51,624.00. (Jan. 22, 2009 Letter from Debtor to Boyd Worsham, Def.'s Ex. 6.) One week later, on January 29, 2009, Haskell filed suit against the Plaintiff and the Surety for payment of the $222,004.00 outstanding on its Supplier Contract. (Pl.'s Ex. 12.)

The Plaintiff challenged Haskell's claim against the payment bond on the grounds that Haskell did not have a contractual relationship with the Plaintiff, had not provided it with written notice within 30 days of its last work on the Project, and was therefore not entitled to payment from the bond. See O.C.G.A. § 13-10-63(a)(2). The Superior Court did not agree:

> The Court finds that O.C.G.A. 13-10-62(a) required that the contractor post the Notice of Commencement on

the public works construction site and file it with the Clerk of the Superior Court in the county in which the site is located. There is no factual dispute that the Notice of Commencement was filed with the Clerk of the Superior Court of Chatham County. There is additionally no dispute that the Notice of Commencement was not posted on the public works construction site.

Therefore, the Court finds since Defendant Pioneer failed to comply with the Notice of Commencement requirements provided for in O.C.G.A. § 13-10-62(a), [Haskell] was not required to file a Notice to Contractor. It may seek payment under the payment bond pursuant to O.C.G.A. § 13-10-63(a)(1) since the contractor did not comply with the notice of commencement requirements and since [Haskell] provided written notice to Pioneer on November 24, 2008, within 90 days from the last day material was furnished that it had not been paid for labor and materials it supplied to the project.

(Jan. 11, 2010 Order on Motions for Summary Judgment, The Haskell Company v. Pioneer Construction, Inc., et. al., Civil Action No. CV09-171BA, Def. Ex. 12 at 6-7.)

Haskell was awarded a judgment against the Plaintiff in the principal amount of $222,004.00, plus pre- and post-judgment interest. (Stip., A.P. ECF No. 49 at 9, ¶ 8.) After appealing the judgment and losing, the Plaintiff paid Haskell $200,000.00 in full satisfaction of its claim against the payment bond. (General Release Executed by The Haskell Company, Pl.'s Ex. 15; May 17, 2011 Satisfaction of Judgment, The Haskell Company v. Pioneer Construction, Inc. and The Ohio Casualty Insurance Company, Civil Action No. CV09-0171-BA, Pl.'s Ex. 16.)

On May 16, 2011, the Plaintiff brought suit against May Specialty and the Debtor in the Superior Court of Bullouch County, Georgia. (May 16, 2011 Superior Court Compl., Pioneer

Construction, Inc. v. May Specialty Fabricators, Inc. and Jeffery A. May, Civil Action No. 1B11CV-284-W, Pl.'s Ex. 17.) The complaint alleged that the Debtor had willfully converted the plaintiff's payments, causing the plaintiff damages, including the $200,000.00 paid to Haskell, plus attorney's fees and litigation costs of $22,480.24 incurred in defending Haskell's suit and appealing the judgment rendered for Haskell therein. (See Superior Court Compl., Pl.'s Ex. 17 at 2-3.) The Plaintiff's complaint also alleged that the Debtor had acted in bad faith entitling the Plaintiff to recover attorney's fees. (See id. ¶ 13.) May Specialty and the Debtor filed an answer denying the allegations in the Plaintiff's complaint on July 5, 2011. (July 5, 2011 Answer, Pioneer Construction, Inc. v. May Specialty Fabricators, Inc. and Jeffery A. May, Civil Action No. 1B11CV-284-W, Pl.'s Ex. 18.)

Although the initial answer was filed by an attorney, the Debtor eventually proceeded pro se as he could no longer afford legal representation. (See Def. Post-Trial Br., A.P. ECF No. 70, at 3.) On February 7, 2012, the Superior Court entered the parties' "Consent Judgment" finding the Debtor and May Specialty jointly and severally liable for the Plaintiff's damages:

> By consent of the parties hereto, it is hereby ORDERED and ADJUDGED that the plaintiff have and recover of the defendants, jointly and severally, the principal sum of $222,480.24 plus attorney's fees of $4,336.97, together

with post-judgment interest at the legal rate and all costs of this action.

SO ORDERED AND ADJUDGED, this 7th day of February, 2012.

(Feb. 7, 2012 Consent Judgment entered in Pioneer Construction, Inc. v. May Specialty Fabricators, Inc. and Jeffery A. May, Civil Action Number IB11CV-284-W, Pl.'s Ex. 19.)

## Bankruptcy

The Debtor filed for chapter 7 relief on July 10, 2012. (ECF No. 1.) May Specialty effectively ceased doing business in early 2009; to date, May Specialty has not filed for bankruptcy protection. (Debtor Dep. 13:12-13:14, Sept. 12, 2013, A.P. ECF No. 63.) The Plaintiff filed its Complaint to Determine the Dischargeability of Debt on September 7, 2012. (ECF No. 16; A.P. ECF No. 1.) The Plaintiff characterized its claim in the same terms it used in its Superior Court complaint:

> 9. The payments received by debtor from plaintiff were subject to a constructive trust in favor of the plaintiff, and the debtor's failure to pass through payments received by the debtor from plaintiff, instead converting said payments to the debtor's own use, constitutes prima facie evidence of debtor's intent to defraud pursuant to O.C.G.A. section 16-8-15(b).

> 10. Having violated O.C.G.A. section 16-8-15, pursuant to O.C.G.A. section 51-10-6, the debtor is liable to the plaintiff in tort for conversion for all damages suffered as a result of said violation.

> 11. The debtor's failure to pass through payments received by the debtor from the owners, instead converting said payments to the debtor's own use, constitutes willful and malicious conversion of the plaintiffs funds pursuant to 11 U.S.C. § 523(a)(6).

AO 72A

(Rev. 8/82)

(A.P. ECF No. 1, ¶¶ 9-11; cf. Pl.'s Ex. 17, ¶¶ 11-15.)

## CONCLUSIONS OF LAW

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition." Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane), No. 13-10560, 2014 WL 2884603 (11th Cir. June 26, 2014) (quoting United States v. Mitchell (In re Mitchell), 633 F.3d 1319, 1326 (11th Cir. 2011) (internal quotations omitted)). However, "this 'fresh start' policy is only available to the 'honest but unfortunate debtor.'" In re Mitchell, 633 F.3d at 1326 (quoting United States v. Fretz (In re Fretz), 244 F.3d 1323, 1326 (11th Cir. 2001)).

"To ensure that only the honest but unfortunate debtors receive the benefit of discharge, Congress enacted several exceptions to § 727(b)'s general rule of discharge." Id. Any debt that results from "willful and malicious injury by the debtor to another entity or to the property of another entity" is one such exception. 11 U.S.C. § 523(a)(6).

I.   **The Preclusive Effect of the State Court Consent Judgment**

At the trial on April 24, 2014, it became apparent that much of the Plaintiff's case depended upon the Court finding that the Consent Judgment entered in State Superior Court preclusively established the Debtor's liability for willful conversion.

Bankruptcy courts have exclusive jurisdiction over issues of nondischargeability; thus, it would not be possible for a state court judgment to have a res judicata (claim preclusion) effect in discharge proceedings. See St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 675-76 (11th Cir. 1993)("While collateral estoppel may bar a bankruptcy court from relitigating factual issues previously decided in state court, however, the ultimate issue of dischargeability is a legal question to be addressed by the bankruptcy court in the exercise of its exclusive jurisdiction to determine dischargeability."); Ga. Lottery Co. v. Kunkle (In re Kunkle), 462 B.R. 914, 922 (Bankr. N.D. Ga. 2011) (state court consent judgment does not create a res judicata defense).

However, the Supreme Court has determined that collateral estoppel principles (issue preclusion) apply in discharge exception proceedings. See Grogan v. Garner, 498 U.S. 279, 284-85 (1991). "Collateral estoppel prohibits the relitigation of issues that have been adjudicated in a prior action. The principles of collateral estoppel apply in discharge exception proceedings in

AO 72A

(Rev. 8/82)

bankruptcy court." Bush v. Balfour Beatty Bahamas, Ltd. (In re Bush), 62 F.3d 1319, 1322 (11th Cir. 1995).

In St. Laurent, the Eleventh Circuit stated: "If the prior judgment was rendered by a state court, then the collateral estoppel law of that state must be applied to determine the judgment's preclusive effect...." 991 F.2d at 676. Thus, Georgia law applies to determine the effect of the state court Consent Judgment. See Hebbard v. Camacho (In re Camacho), 411 B.R. 496, 501-02 (Bankr. S.D. Ga. 2009); NBA Props., Inc. v. Moir (In re Moir), 291 B.R. 887, 891 (Bankr. S.D. Ga. 2003).

In Georgia, a party seeking to assert collateral estoppel must demonstrate that (1) an identical issue, (2) between identical parties, (3) was actually litigated and (4) necessarily decided, (5) on the merits, (6) in a final judgment, (7) by a court of competent jurisdiction. See Cmty. State Bank v. Strong, 651 F.3d 1241, 1264 (11th Cir. 2011); Body of Christ Overcoming Church of God, Inc. v. Brinson, 287 Ga. 485, 486 (2010).

As the Eleventh Circuit noted in Halpern v. First Ga. Bank, (In re Halpern), judgments entered by consent alter the typical issue preclusion analysis:

> The requirements that issues be actually litigated and necessary to the judgment in order for issue preclusion to apply are altered somewhat in the context of consent decrees. As we stated in Barber v. International Brotherhood of Boilermakers, 778 F.2d 750, 757 (11th Cir. 1985), "[t]he very purpose of [consent] decrees is

AO 72A
(Rev. 8/82)

to avoid litigation, so the requirement of actual litigation necessary to preclusion always will be missing." Instead, the central inquiry in determining the preclusive effect of a consent judgment is the intention of the parties as manifested in the judgment or other evidence.

810 F.2d 1061, 1063-64 (11th Cir. 1987).

Likewise, the Georgia Supreme Court has held that the preclusive effect of a consent judgment entered in state court does not depend on the legal or factual issue having been actually litigated:

> [A] consent judgment differs from a judgment rendered on the merits in that it results from an affirmative act of the parties rather than the considered judgment of the court following litigation of the issues. A consent judgment is one entered into by stipulation of the parties with the intention of resolving a dispute, and generally is brought to the court by the parties so that it may be entered by the court, thereby compromising and settling an action. (Footnote omitted.) City of Centerville v. City of Warner Robins, 270 Ga. 183, 184(1), 508 S.E.2d 161 (1998).
> Although a consent judgment is brought about by agreement of the parties, it is accorded the weight and finality of a judgment. Thus, a consent decree is an enforceable judgment and can be accorded preclusive effect. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378(II), 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (consent judgment is agreement that parties desire and expect will be enforceable as judicial decree subject to rules applicable to other judgments and decrees). However, it is also a contract and, therefore, it must be interpreted like any other contract. See City of Centerville, supra at 186, 508 S.E.2d 161; Wright, Miller & Cooper, 18A Federal Practice and Procedure: Jurisdiction 2d § 4443, p. 262 (contractual "nature of consent judgments has led to general agreement that preclusive effects should be

AO 72A

(Rev. 8/82)

measured by the intent of the parties" (footnote omitted)).

*Brown, etc. Corp. v. Gault,* 280 Ga. 420, 423-424(3) (2006).

Thus, a state court consent judgment is preclusive only to the extent that the parties intended the judgment to be a final adjudication of the factual and legal issues. See *id.*; *Gutherie v. Ford Equip. Leasing Co.,* 231 Ga. App. 350, 351 (1998). "A consent judgment cannot constitute collateral estoppel unless the party pleading collateral estoppel proves from the record of the prior case or through extrinsic evidence that the parties intended the consent judgment to operate as a final adjudication of a particular issue." *Balbirer v. Austin,* 790 F.2d 1524, 1528 (11th Cir. 1986).


### A.   The Consent Judgment Preclusively Establishes the Debtor's Liability for the Debt.

The parties' resolution of their lawsuit, titled simply "Consent Judgment," is notably devoid of both factual findings and legal conclusions:

> By consent of the parties hereto, it is hereby ORDERED and ADJUDGED that the plaintiff have and recover of the defendants, jointly and severally, the principal sum of $222,480.24 plus attorney's fees of $4,336.97, together with post-judgment interest at the legal rate and all costs of this action.
> SO ORDERED AND ADJUDGED, this 7th day of February, 2012.

(Consent Judgment, Pl.'s Ex. 19.)

The Consent Judgment does not cite to a specific Georgia statute, incorporate either party's pleading by reference, or establish a theory of recovery. See In re St. Laurent, 991 F.2d at 676. There is no evidence, either according to the terms of the Consent Judgment or from other extrinsic sources, that would indicate that the parties intended the Consent Judgment as a final adjudication of any issue other than the debt owed to the Plaintiffs. (See Consent Judgment, Pl.'s Ex. 19).

Rather, the Consent Judgment merely establishes the debt for which the Debtor and May Specialty are jointly and severally liable. See In re St. Laurent, 991 F.2d at 676. Absent proof the parties necessarily applied a particular theory of recovery to determine the debt, the Consent Judgment has no preclusive effect regarding the willful or malicious nature of the injury to the Plaintiff. See id.; Terhune v. Houser (In re Houser), 458 B.R. 771, 781 (Bankr. N.D. Ga. 2011)(refusing to apply collateral estoppel when plaintiff's state court award of punitive damages was based on one or more disjunctive options: "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences").

AO 72A
(Rev. 8/82)

### B.   The Consent Judgment Does Not Bar the Debtor's Arguments Regarding Dischargeability.

The Plaintiff argues that res judicata bars any defenses the Debtor may raise with regard to liability for conversion or for the dollar amount of that liability. (See Pl.'s Post-Trial Br., A.P. ECF No. 71, at 2.) Specifically, the Plaintiff objects to two of the Debtor's arguments that could have been asserted in the state court proceeding but were not. First, the Debtor argues that the Plaintiff caused its own injury by failing to comply with the notice requirements of O.C.G.A. § 13-10-62: "The order of the Superior Court of Chatham County makes it clear that had [the Plaintiff] posted the Notice Haskell's complaint would not have been timely and would have been dismissed." (Def.'s Proposed Findings of Fact and Conclusions of Law, A.P. ECF No. 60, at 5.) Second, the Debtor argues that May Specialty paid a majority of the funds to its suppliers on the Project; had May Specialty chosen to pay Haskell, then those unpaid suppliers could have made claims against the Plaintiff. (See id. at 4.)

The Plaintiff is correct to object to these arguments in one respect. The Consent Judgment precludes the Debtor from re-litigating the validity of the debt. See Kerr v. Meadors (In re Knott), 482 B.R. 852, 854 (Bankr. N.D. Ga. 2012)("general rule is that a party cannot re-litigate in bankruptcy court a state court's determination of the amount of a claim.") Had these

AO 72A
(Rev. 8/82)

defenses been presented at the Superior Court, they would have addressed the validity and amount of the Plaintiff's claims; the Consent Judgment bars the Debtor from re-litigating these issues now. To the extent these arguments are offered to reduce or challenge the validity of the underlying debt, the Debtor is barred from raising them in bankruptcy court.

However, to the extent that these arguments address the dischargability of the debt under 11 U.S.C. § 523(a)(6), these otherwise precluded arguments fall within the exclusive jurisdiction of the bankruptcy court. See In re St. Laurent, 991 F.2d at 675. In exercising this exclusive jurisdiction, bankruptcy courts look beyond the record of a state court proceeding in which a consent judgment was entered to determine if the underlying debt is dischargeable. See In re Kunkle, 462 B.R. at 922 (quoting Brown v. Felsen, 442 U.S. 127, 138-39 (1979))("[T]he mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt.").

Both of the arguments to which the Plaintiff objects would, if accepted by the Court, mitigate the malicious element of his actions. See Wolfson v. Equine Capital Corp. (In re Wolfson), 56 F.3d 52, 55 (11th Cir. 1995); Thompson v. Barbee (In re Barbee), 479 B.R. 193, 209 (Bankr. S.D. Ga. 2012).

34

Under circumstances analogous to the Plaintiff's failure to comply with O.C.G.A. § 13-10-62, the Eleventh Circuit has found a Debtor's willful conversion of collateral was not malicious when the creditor failed to take reasonable steps to protect its property from injury. See In re Wolfson, 56 F.3d at 55. Likewise, if the Debtor had in fact made proper payment to other creditors, his actions would not be malicious. See In re Barbee, 479 B.R. at 209 (finding the Debtor's use of loaned funds to obtain reimbursement to which he was arguably entitled from lender was not malicious when Plaintiffs failed to sufficiently establish that the Debtor was not entitled to the compensation for legitimate business expenses); Mason Lumber Co. v. Martin (In re Martin), 70 B.R. 146, 152-53 (Bankr. M.D. Ala. 1987)(finding debtor/home-contractor's conversion of funds assigned to lumber company was not 'malicious' where substantially all of converted funds were used to pay materialmen and labor, costs necessary to continue operations in effort to preserve business, and the debtor expected to be able to pay lumber company out of profits from other homes).

### C.   The Consent Judgment Does Not Establish a Constructive Trust in Favor of the Plaintiff for the Debtor's Willful Conversion Under O.C.G.A. §§ 16-8-15 and 51-10-6.

The Plaintiff argues that the Consent Judgment was intended to establish the Debtor's liability for "conversion of funds paid

to the Debtor by [Plaintiff], pursuant to OCGA §§ 51-6-10 and 16-8-15, by virtue of Debtor's . . . failure to pass those payments through to Haskell." (See Superior Court Compl., Pl.'s Ex. 17; A.P. ECF No. 1.) According to the Plaintiff, the Debtor has violated O.C.G.A. § 16-8-15 and therefore, pursuant to § 51-10-6:

> The payments received by Debtor from plaintiff were **subject to a constructive trust in favor of the plaintiff**, and the Debtor's failure to pass through payments received by the Debtor from plaintiff, instead converting said payments to the Debtor's own use, constitutes prima facie evidence of Debtor's intent to defraud pursuant to O.C.G.A. Section 16-8-15(b).

(Pl.'s Ex. 17 at 3-4) (emphasis added.)

Section 51-10-6 provides: "Any owner of personal property shall be authorized to bring a civil action to recover damages from any person who **willfully damages the owner's personal property or who commits a theft as defined in Article 1 of Chapter 8 of Title 16 involving the owner's personal property.**" O.C.G.A. § 51-10-6 (emphasis added.)

Section 16-8-15 is a criminal statute that makes it a felony for a contractor who, with the intent to defraud, uses the "proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor or service performed on or materials furnished by his order for this specific improvement." O.C.G.A. § 16-8-15. Subsection (b) of

§ 16-8-15 provides that evidence of non-payment is prima facie evidence of an intent to defraud. Id.

The Plaintiff's application of O.C.G.A. § 16-8-15 is problematic for a number of reasons.

First, the Plaintiff has not established the elements necessary for a violation of § 16-8-15 and there is no evidence the Debtor has been charged with or found guilty of a violation. See Thompson v. State, 233 Ga. App. 792, 793 (1998)(finding evidence was insufficient to prove a contractor/defendant violated O.C.G.A. 16-8-15 when the contractor unequivocally testified that he withheld money as "off-set" bill). In order to convict a contractor under § 16-8-15, "it is necessary to show the creation of the trust described in the indictment and fraudulent breach of that trust in the manner alleged." Teston v. State, 194 Ga. App. 324, 325 (1990)(quoting Davis v. State, 122 Ga. App. 311, 315-316 (1970)). The Plaintiff has not demonstrated that the funds paid to May Specialty were explicitly entrusted to it for the specific purpose of paying Haskell. Neither the Subcontract nor the Purchase Order between May Specialty and the Plaintiff require May Specialty to pay its suppliers before itself. (See Purchase Order, Pl.'s Ex. 6; Subcontract, Pl.'s Ex. 7.)

Second, O.C.G.A. § 16-8-15 does not create a property right in the misappropriated funds that would entitle the Plaintiff to

AO 72A

(Rev. 8/82)

recovery. Under 11 U.S.C. § 523(a)(6), "the injury must invade the creditor's legal rights ... 'in the technical sense, not simply harm to a person.'" In re Barbee, 479 B.R. at 208 (citing Musilli v. Droomers (In re Musilli), 379 Fed. Appx. 494, 498 (6th Cir. 2010) (listing conversion as a type of misconduct that satisfies willful and malicious injury)).

In Doyle Dickerson Co. v. Durden, a subcontractor used O.C.G.A. § 16-8-15 to allege that funds received by a bankrupt general contractor "as payment for the improvement of real property were subject to a trust in favor of those who furnished labor and materials used in completing the improvements." 218 Ga. App. 426, 426-27 (1995). Like the present case, the subcontractor's complaint also alleged that the president and sole shareholder of the defunct general contractor had "knowingly converted the trust funds including those sums that were due plaintiff." Doyle Dickerson Co., 218 Ga. App. at 427. The Georgia Appeals Court found that the subcontractor had failed to state a claim. The Court explicitly stated that O.C.G.A. § 16-8-15 does not give rise to a civil cause of action, nor does it create a property right in the allegedly misappropriated funds. See Doyle Dickerson Co., 218 Ga. App. at 428 ; see also Rolleston v. Huie, 198 Ga. App. 49 (1990)(denying a violation of O.C.G.A. § 16-8-16, theft by extortion, creates a private cause of action for those injured absent explicit statutory language to the contrary).

Third, the Plaintiff's reliance on O.C.G.A. § 51-10-6 to address these issues is misplaced. The Plaintiff argues that the application of O.C.G.A. § 51-10-6 provides an explicit right to a civil action to remedy the harm done by the Debtor's violation of O.C.G.A. § 16-8-15. (Pl.'s Post-Trial Reply Br., A.P. ECF No. 72, at 5.) However, Georgia case law makes it clear that § 51-10-6 does not create a private right of action for every property crime. See Anthony v. Am. Gen. Fin. Servs., Inc., 287 Ga. 448, 455-59 (2010) (citing Doyle Dickerson Co. v. Durden for the proposition that criminal violations will not create a civil action absent explicit statutory language); Murphy v. Bajjani, 282 Ga. 197, 201 (2007) ("There is no indication that the legislature intended to impose civil liability in addition to the criminal sanctions set forth in a statute where, as here, nothing in the provisions of the statute creates a private cause of action in favor of the victim purportedly harmed by the violation of the penal statute.")

Moreover, O.C.G.A. § 51-10-6 was in effect when Doyle Dickerson Co. v. Durden was decided. Compare Doyle Dickerson Co. v. Durden, 218 Ga. App. 426, 428 (1995) with § 51-10-6 Code 1981, § 51-10-6, enacted by Ga. L. 1988, p. 404, § 1; Ga. L. 1991, p. 1126, §§ 1-3; Ga. L. 2000, p. 1589, § 3. Nevertheless, the Dickerson court held that "the violation of a penal statute does not automatically give rise to a civil cause

39

of action on the part of one who claims to have been injured thereby since reference must be made to the applicable provisions of tort law." See Doyle Dickerson Co., 218 Ga. App. at 427 (citing Rolleston v. Huie, 198 Ga. App. at 50).

Even assuming O.C.G.A. § 51-10-6 did create a private right of action in favor of the Plaintiff, there is no reason that right would also include the evidentiary presumption of a prima facie intent to defraud when evidence of nonpayment is produced. The scope of O.C.G.A. § 51-10-6 encompasses "theft as defined by Article 1 of Chapter 8 of Title 16." It does not import every standard or presumption of that portion of Georgia's Criminal Code.

Finally, even if O.C.G.A. §§ 16-8-15 and 51-10-6 did apply, the Plaintiff would still not be entitled to a constructive trust. See Hudspeth v. A & H Constr., Inc., 230 Ga. App. 70, 71 (1997)("Money can be the subject of a conversion claim as long as the allegedly converted money is specific and identifiable.")) In Georgia, a constructive trust requires the existence of a trust res; a beneficiary of a constructive trust is entitled to payment from trust assets only if the trust assets are traceable. See Bethlehem Steel Corp. v. Tidwell, 66 B.R. 932, 941 n.12 (M.D. Ga. 1986). Here, the Plaintiff has made no effort to trace any assets that might constitute a res for a constructive trust. (See A.P. ECF No. 61.)

Finally, bankruptcy courts in Georgia have refused to apply § 16-8-15 to create a constructive trust in favor of an unpaid subcontractor, much less in favor of a fully paid general contractor one step removed from the offending transaction. See Wachovia Bank of Ga. v. Am. Bldg. Consultants, Inc. (In re Am. Bldg. Consultants, Inc.), 138 B.R. 1015, 1018 (Bankr. N.D. Ga. 1992); see also Hensler & Beavers Gen. Contr., Inc. v. Sanford (In re Sanford), Case No. 11-43035-PWB, A.P. No. 11-4063, 2011 WL 7090746 at n.1 (Bankr. N.D. Ga. Dec. 22, 2011)(finding plaintiff failed to state a claim for which relief could be granted under § 523(a)(2)(A) when its complaint merely alleged defendant violated O.C.G.A. § 16-8-15, a criminal statute); Golden Isles Drywall, Inc. v. Stone (In re Stone), No. 95-20239, A.P. No. 95-2033, 1996 WL 34579205 (Bankr. S.D. Ga. Jan. 29, 1996)(refusing to apply O.C.G.A. § 16-8-15 to impose a fiduciary duty on contractors to pay their suppliers).

Accordingly, contrary to the Plaintiff's assertions, the funds paid to May Specialty by the Plaintiff were not "as a matter of law earmarked for and required to be passed through for payment of suppliers on the Reefer Racks project." (Pl.'s Post-Trial Reply Br., A.P. ECF No. 72, at 5.)

41

### D. The Amount Awarded to the Plaintiff in the Consent Judgment is Consistent with an Award for Breach of Contract; Therefore, the Measure of Damages is Insufficient to Establish the Debtor's Liability for Willful Conversion.

According to the Plaintiff, as the Consent Judgment was in the precise amount of its alleged compensatory damages for willful conversion, the only basis upon which the state court could have approved the Debtor's consent to liability is that alleged in the Plaintiff's complaint. (Pl.'s Post-Trial Reply Br., A.P. ECF No. 72, at 5.)

However, this is not necessarily the case. See Branton v. Hooks (In re Hooks), 238 B.R. 880, 886 (Bankr. S.D. Ga. 1999). An issue is "necessarily decided" if, in the absence of a determination of the issue, the judgment could not have been validly rendered. Henderson v. Woolley (In re Woolley), 288 B.R. 294, 300-01 (Bankr. S.D. Ga. 2001). A court may "infer facts for purposes of collateral estoppel if the finding is necessarily implied from the nature of the claim and award." Schlenkerman v. Goldbronn (In re Goldbronn), 263 B.R. 347, 360 (Bankr. M.D. Fla. 2001) (internal quotation marks omitted)(finding, in absence of factual findings by arbitration panel, that award itself established "those facts necessary to support a violation under [the relevant state statute]").

The "compensatory damages" awarded to the Plaintiff by the Consent Judgment consists of amounts the Plaintiff paid to

AO 72A
(Rev. 8/82)

Haskell to satisfy its bond claim plus legal expenses incurred in defense of that claim. (Compare Compl. filed in The Haskell Company v. Pioneer Construction, Inc. and The Ohio Casualty Insurance Company, Civil Action Number CV09-0171-BA, Pl.'s Ex. 12 with Consent Judgment, Pl.'s Ex. 19.) Under the terms of the Subcontract, May Specialty was obligated to broadly indemnify the Plaintiff for damages of exactly this kind:

> 16.1 **SUBCONTRACTOR'S PERFORMANCE:** The Subcontractor shall indemnify and save harmless the Owner and the Contractor, including their officers, agents, employees, affiliates, parents and subsidies, and each of them, of and from any and all claims, demands, causes of action, damages, costs, expenses, **actual attorneys' fees,** losses or liabilities arising out of or in connection with the Subcontractor's operations to be performed under this Agreement for, but not limited to:

> . . .

> 16.1.4    Claims and liens for labor performed and **materials used and furnished on the job,** including **all incidental and consequential damages resulting to the Contractor or Owner from such claims** or liens.

(Subcontract, Pl.'s Ex. 7 at 18-19) (emphasis added.)

Accordingly, the measure of damages alone is insufficient to establish the Debtor's liability for willful conversion under O.C.G.A. § 16-8-15. See McMahon v. State, 284 Ga. App. 192, 195 (2007) (Defendant acquitted of three of ten counts under O.C.G.A. § 16-8-15 could be ordered to pay restitution of full amount based on breach of contract theory as civil action corresponding

to § 16-8-15 is breach of contract). As the Eleventh Circuit has previously noted: "[I]f the judgment fails to distinguish as to which of two or more independently adequate grounds is the one relied upon, it is impossible to determine with certainty what issues were in fact adjudicated, and the judgment has no preclusive effect." In re St. Laurent, 991 F.2d at 676 (internal citations omitted).

### E.   The Award of Attorneys' Fees Does Not Establish Malice.

Finally, the Plaintiff maintains that the Consent Judgment's award of attorneys' fees establishes the Debtor's actions were taken in bad faith and are therefore malicious. See O.C.G.A. § 13-6-11. In Georgia, attorneys' fees are recoverable as special damages flowing from the underlying intentional tort when the Defendant's tortious conduct falls within the scope of O.C.G.A. § 13-6-11. See Kasper v. Turnage (In re Turnage), 460 B.R. 341, 347-48 (Bankr. N.D. Ga. 2011). Section 13-6-11 provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and **where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense,** the jury may allow them.

O.C.G.A. § 13-6-11 (emphasis added).

AO 72A
(Rev. 8/82)

The Plaintiff correctly asserts that an award of attorneys' fees under O.C.G.A. § 13-6-11 may establish malice under 11 U.S.C. § 523(a)(6). See In re Demps, 506 B.R. at 171 (arbitration award of attorneys' fees under O.C.G.A. § 13-6-11 was sufficient to establish maliciousness for purpose of non-dischargeability).

However, as with the compensatory damages previously discussed, there are multiple theories of recovery upon which the Plaintiff might have been entitled to attorneys' fees that do not require a finding of bad faith. See In re St. Laurent, 991 F.2d at 676.

First, the Plaintiff may have been entitled to attorneys' fees under its contracts with May Specialty. In addition to the broad indemnification discussed above, Section 15.8 of the Subcontract provides:

> **ATTORNEYS' FEES:** Should the Subcontractor [May Specialty] default in any of the provisions of this Agreement and should the Contractor [Plaintiff] employ an attorney to enforce any provision hereof or to collect damages for material breach of this Agreement the Subcontractor and his Surety agree to pay the Contractor such reasonable attorneys' fees as he may expend therein.

(Subcontract, Pl.'s Ex. 7 at 18.) Unlike O.C.G.A. § 13-6-11, the terms of the contract that entitle the Plaintiff to attorneys' fees do not require a finding of bad faith.

Second, the Plaintiff may have been entitled to its attorneys' fees under O.C.G.A. § 13-11-8 of Georgia's Prompt Pay Act:

> In any action to enforce a claim under the Georgia Prompt Pay Act, the prevailing party is entitled to recover a reasonable fee for the services of its attorney, including but not limited to, trial, appeal, and arbitration in an amount to be determined by the court or the arbitrators, as the case may be.

O.C.G.A. § 13-11-8.

Georgia's Prompt Pay Act governs "[p]erformance by a contractor ... in accordance with the provisions of his or her contract and the satisfaction of the conditions of his or her contract precedent to payment entitles such person to payment from the party with whom he or she contracts." O.C.G.A. § 13-11-3; (see also Pl.'s Post-Trial Reply Br., A.P. ECF 72, at 5)(Georgia's Prompt Pay Act determines rights of the parties). Like the Plaintiff's contractual right to attorneys' fees, an award of attorneys' fees under O.C.G.A. § 13-11-8 does not require a finding of bad faith. See Elec. Works CMA, Inc. v. Baldwin Technical Fabrics, LLC, 306 Ga. App. 705, 708 (2010)(electrical contractor was entitled to attorney fees under Prompt Pay Act even if contractor did not produce any evidence of bad faith as entitlement to attorney fees under the Prompt Pay Act does not require a showing of bad faith); Hampshire Homes v. Espinosa Constr. Servs., 288 Ga. App. 718, 723(2)(b) (2007)).

AO 72A

(Rev. 8/82)

Absent an indication which of these independent grounds supported the award of attorneys' fee in the Consent Judgment, the award itself has no preclusive effect. See In re St. Laurent, 991 F.2d at 676.

## II. The Plaintiff Has Not Established that the Debtor's Actions Amounted to a Willful and Malicious Injury Under 11 U.S.C. § 523(a)(6).

A debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge. 11 U.S.C. § 523(a)(6). The burden is on the creditor to prove the exception to discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. at 287-88; In re St. Laurent, 991 F.2d 672, 680 (11th Cir. 1993). A presumption exists that all debts owed by the debtor are dischargeable unless the party contending otherwise proves non-dischargeability. See 11 U.S.C. § 727(b); In re Turnage, 460 B.R. at 345. Thus, courts narrowly construe exceptions to discharge in favor of the debtor in order to give effect to the fresh start policy of the Bankruptcy Code. See Hope v. Walker (In re Walker), 48 F.3d 1161, 1164-65 (11th Cir. 1995); Equitable Bank v. Miller (In re Miller), 39 F.3d 301 (11th Cir. 1994); In re St. Laurent, 991 F.2d at 680.

"Willful and malicious injury includes willful and malicious conversion." In re Wolfson, 56 F.3d at 54. Under Georgia law,

47

"conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." In re Moir, 291 B.R. 887, 892 (Bankr. S.D. Ga. 2003) (quoting Adler v. Hertling, 215 Ga. App. 769, 772 (1994)). In the context of § 523(a)(6), "the injury must invade the creditor's legal rights . . . 'in the technical sense, not simply harm to a person.'" In re Barbee, 479 B.R. at 208 (Bankr. S.D. Ga. 2012)(quoting In re Musilli, 379 Fed. Appx. at 498).

Here, the Plaintiff has not established that it retained a property interest in its final payment to May Specialty. The Plaintiff based its conversion claim on its property interest in funds it was contractually obligated to pay May Specialty: "[T]he payments received by debtor from plaintiff were subject to a constructive trust in favor of the plaintiff." (Pl.'s Ex. 17, ¶ 9.) However, as previously discussed, neither the Consent Judgment nor Georgia law establishes that the Plaintiff retained a property interest in its Final Progress Payment to May Specialty. A violation of O.C.G.A. § 16-8-15 does not grant its victims an equitable property interest in the fraudulently obtained funds. See Doyle Dickerson Co. v. Durden, 218 Ga. App. at 427. The Consent Judgment does nothing more than establish the

debt; it does not establish the nature of the debt, nor does it recognize a constructive trust in favor of the Plaintiff. Indeed, looking to the Consent Judgment itself, the damages could have been based either on a breach of contract or a financial tort. Simply put, the Plaintiff did not have a property interest in the progress payments that the Debtor could convert.

The Plaintiff has done nothing to differentiate its damages from those to which it would be entitled on a simple breach of contract claim. Although debts for breach of contract typically fall outside the scope of 11 U.S.C. § 523(a)(6), "a knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of the existence of separate tortious conduct." In re Kane, 2014 WL 2884603 at *9 (quoting Williams v. Int'l Brotherhood of Elec. Workers Local 520 (In re Williams), 337 F.3d 504, 510 (5th Cir. 2003)).

However, the kind of contract breaches that satisfy the requirements of 11 U.S.C. § 523(a)(6) is severely limited. See Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998)(rejecting an interpretation of § 523(a)(6) that would render any knowing breach of contract nondischargeable). Decisions finding breach of contract damages within the scope of 11 U.S.C. § 523(a)(6) typically fall into two fact patterns. First, courts often find contract breach claims nondischargable when the damages are based

on a security agreement granting the creditor a legal property interest in collateral that is then converted by the debtor for a non-business purpose. See In re Barbee, 479 B.R. at 208-09 (debtor's conversion of creditor's security interest was non-dischargeable when the debtor "consciously chose to use the accounts receivable to pay a business debt of [the Corporation] for which he was personally liable"); Legendary Loan Link, LLP, v. Glatt (In re Glatt), 315 B.R. 511, 521-22 (Bankr. D.N.D. 2004)(finding required malice was not present when debtor used the proceeds of creditor's collateral to continue operating his business); Auto. Fin. Corp. v. Penton (In re Penton), 299 B.R. 701, 707 (Bankr. S.D. Ga. 2003)(finding damages for debtor's violation of a security agreement were non-dischargeable when debtor willfully converted creditor's collateral, knowing that his actions would cause the creditor loss).

Alternatively, damages for a breach of contract may be non-dischargeable when the contract's terms are sufficiently restrictive regarding the use of specified funds to impose a fiduciary duty on the debtor. See Citizens Bank of Washington Cnty. v. Wright (In re Wright), 299 B.R. 648, 661-62 (Bankr. M.D. Ga. 2003)(quoting Ford Motor Credit Co. v. Owens, 807 F.2d 1556, 1559 (11th Cir. 1987)(finding creditor's claim was non-dischargeable when the "floor plan agreement specified that [the dealership] had a duty to hold in trust all proceeds of any sale

or other disposition of all merchandise subject to [the creditor's] purchase money security interest and to remit such proceeds promptly to [the creditor]").

Unlike the present case, these fact patterns involve a violation of the creditor's legal rights in property that goes beyond a mere contractual obligation. See In re Barbee, 479 B.R. at 208. Comparatively, here, neither the Subcontract nor the Purchase Order granted the Plaintiff a security interest in progress payments. (See Pl.'s Ex. 6, 7.) Furthermore, May Specialty's use of the progress payment funds was not earmarked or specifically restricted to paying off suppliers. See Fiandola v. Moore (In re Moore), 508 B.R. 488, 499 (Bankr. M.D. Fla. 2014)(finding a plaintiff's judgment debt dischargeable when there was no evidence that the debtor was prohibited from depositing plaintiffs' deposits into its business's general operating account and using those funds to pay for general business expenses); see also Rentrak Corp. v. Neal (In re Neal), 300 B.R. 86, 95 (Bankr. M.D. Ga. 2003)("[W]here a debtor is not required to isolate funds in a separate account and has unrestricted use of the funds, the creditor is merely an unpaid creditor rather than a victim of embezzlement"). Here, the Debtor was under no special obligation to use the progress payments to pay Haskell. See Ford Motor Credit Co. v. Moody (In re Moody), 277 B.R. 865, 871 (Bankr. S.D. Ga. 2001)(finding injury caused by

debtor's use of sale-out-of-trust proceeds did not fall within 11 U.S.C. § 523(a)(6) when "Plaintiff was aware of the commingling of funds and never required a separate account be maintained for the proceeds").

Finally, the Plaintiff's failure to take reasonable steps to protect itself from claims against its payment bond prevents the application of 11 U.S.C. § 523(a)(6). See In re Wolfson, 64 F.3d at 55. As the Superior Court noted in its January 11, 2010, Order, Haskell's claim would have been barred under O.C.G.A. § 13-10-63 if the Plaintiff had complied with the Notice of Commencement requirements of O.C.G.A. § 13-10-62(a). (See Def. Ex. 12 at 6-7.) The Debtor had no control over the Plaintiff's compliance with O.C.G.A. § 13-10-62(a). Any injury resulting from the Plaintiff's failure to comply is not the Debtor's responsibility.

AO 72A
(Rev. 8/82)

**ORDER**

Based on the foregoing Findings of Fact and Conclusions of Law, I find that the Plaintiff has failed to meet its burden of proof under 11 U.S.C. § 523(a)(6). Accordingly, judgment is ORDERED entered for the defendant, Jeffery A. May, finding the debt due to the Plaintiff, Pioneer Construction, Inc., discharged in the defendant's bankruptcy case #12-60371.

JOHN S. DALIS
United States Bankruptcy Judge

Dated at Brunswick, Georgia,
this 29th day of August, 2014.

AO 72A
(Rev. 8/82)